Filed 7/1/26  P. v. Osman CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MAHAD AWEIS OSMAN,<br><br>    Defendant and Appellant. | H052518<br>(Santa Clara County<br>Super. Ct. No. C1919726) |

Mahad Aweis Osman was convicted of first degree murder for shooting and killing Savion Hollingsworth.  On appeal, Osman challenges the sufficiency of the evidence for first degree murder.  He also argues the trial court erred in giving the jury an instruction on the lying-in-wait theory of first degree murder.  As explained below, we conclude the evidence was sufficient to convict Osman of first degree murder on a theory of deliberate and premeditated murder.  We also conclude that the trial court erred in instructing the jury on the lying-in-wait theory but that this error was harmless.  Accordingly, we affirm the judgment.

## I. BACKGROUND

### A. The Offense

On October 17, 2019, Osman visited a friend who was attending college in San Jose and a group of his friend's classmates, including Milo Upchurch.  The next day

Tyree Harper flew up to San Jose from Los Angeles. On October 19, 2019, this group and a few others went to a party at an off-campus student apartment complex.

At the party, a fight between several young women began in the building's courtyard, and various people recorded the fight on their phones, some close by, some from elevated positions on balconies. Then, a fight broke out between a large group of young men in the courtyard. Upchurch was in the midst of the scrum near Harper and Hollingsworth, while Osman was on a set of stairs observing the action. Two other participants in the brawl pulled Upchurch's denim jacket over his head.

Moments later, Osman left the stairs and entered the courtyard for the first time in the videos. He maneuvered around the outside of the ongoing brawl, with the wall of the courtyard on his flank, and he moved his arm as if trying to get around the people in front of him. When a few of these people moved aside, standing behind Harper, he raised a gun, fired a single shot, lowered his hand, turned, and left.

The crowd scattered. Hollingsworth lay on the ground bleeding from a gunshot wound to his torso, saying, "I can't feel my legs." Several partygoers, including Harper, tried to assist Hollingsworth. Soon after police arrived, Hollingsworth suffered cardiac arrest, and paramedics took him to a hospital, where he was pronounced dead.

Upchurch, who had been very drunk at the party, woke up the next day with no memory of the shooting but learned of it from a friend. Later, he met with several friends, including Osman. While Upchurch and Osman were walking alone apart from the rest of the group, Osman told Upchurch he had shot someone the previous night.

**B. The Investigation and Charges**

Although a bullet core was found in Hollingsworth, police investigators did not find the bullet casing, and no witnesses identified the shooter. However, the investigators obtained cell-phone videos from before and during the shooting, and they identified the suspected shooter by his dark puffy jacket and skullcap, with black sweatpants bearing

white vertical stripes. Police initially focused on Harper, but excluded him as a suspect because he tried to assist the victim after the shooting, and the videos showed the gunshot going off by his shoulder.

The police identified Osman in other videos from that night by his clothing and arrested him four days after the shooting. Although they did not find the firearm, they found the shooter's clothing and videos on Osman's phone with him in the clothing and holding a firearm.

In October 2019, a complaint charged Osman with a single count of first degree murder (Pen. Code, § 187, subd. (a)) and intentional discharge of a firearm (*id*., § 12022.53, subd. (d)). (Subsequent undesignated statutory references are to the Penal Code.) Two years later, in the operative amended information, Osman was similarly charged with a single court of first degree murder (§ 187, subd. (a)), along with enhancements for intentionally discharging a firearm (§ 12022.53, subd. (d)), using a weapon in the commission of a crime (§ 1170, subd. (b)), and committing a crime involving great violence (§ 1170, subd. (b)).

## B. The Trial

In April 2024, the case went to trial, which lasted six days.

The prosecution presented several expert witnesses. A forensic video analysis expert testified about compiling the numerous cell-phone videos of the shooting and its prelude into two synchronized videos, which the jury viewed with her explanation. With a blue arrow pointing out Osman, a green arrow for Hollingsworth, and a pink or purple arrow for Harper, the compiled video showed the jury how Osman had stayed aloof from the initial brawl, then moved into the courtyard shortly after Upchurch's jacket was pulled over his head, and fired a single shot at Hollingsworth. In addition, a firearms expert testified that the firearm Osman displayed in the videos on his phone was one of

3

roughly 64 types of firearms that could have fired the 9-millimeter copper-jacketed hollow-point round with specific ballistic characteristics that was found in Hollingsworth.

The prosecution also presented excerpts of Osman's phone calls from jail. In them, Osman declared that in discovery he had seen no incriminating witnesses or statements.

Osman did not testify in his own defense.

The parties stipulated to the jury instructions. The court instructed the jury on first degree murder with reference to two theories: (1) premeditation and deliberation and (2) lying in wait. The lying-in-wait instruction required the jury to find three elements: "first, [Osman] concealed his purpose from the person killed; second, he waited and watched for an opportunity to act; and, third, then, from a position of advantage, he intended to and did make a surprise attack on the person killed." The jury was further instructed that the duration of the watching and waiting "must be substantial enough to show a state of mind equivalent to deliberation and premeditation."

In closing, the prosecutor first argued that the murder of Hollingsworth was both deliberate and premeditated. Afterwards, the prosecutor argued that Osman had murdered Hollingsworth by means of lying in wait. The defense argued that Osman was innocent and Harper was the shooter.

After deliberating for less than a day, the jury reached a verdict. It found Osman guilty of first degree murder with a personal firearm discharge causing death.

The trial court sentenced Osman to two consecutive terms of 25 years to life. Osman filed a notice of appeal the day of his sentencing.

## II. DISCUSSION

Osman challenges his murder conviction on two grounds. First, he argues that the evidence was insufficient to prove first degree murder. Second, he argues that the trial

4

court should not have instructed the jury on murder by means of lying in wait. We address these arguments below.

## A. Sufficient Evidence

Murder is the unlawful killing of a human being with malice aforethought (§ 187, subd. (a)), and a murder is in the first degree when it is accompanied by means of, among other things, "lying in wait" or "any other kind of willful, deliberate, and premeditated killing" (*id*., § 189, subd. (a)). At trial the prosecution contended that Osman was guilty of first degree murder on theories of both lying in wait and premeditation. Osman argues the prosecution presented insufficient evidence to support either theory of first degree murder. We need only consider the premeditation theory.

### 1. *The Substantial Evidence Standard*

To evaluate sufficiency of the evidence, reviewing courts apply the substantial evidence standard. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 (*Kraft*).) Under this standard, courts "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.; see also *People v. Stacy* (2010) 183 Cal.App.4th 1229, 1234 [analyzing whether " ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" ' "].) Because the substantial evidence standard examines whether a rational trier of fact could have found a defendant guilty, appellate courts applying the standard do not evaluate witness credibility or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Instead, the substantial evidence standard is deferential (*People v. Semaan* (2007) 42 Cal.4th 79, 88), and an appeals court applying it " 'must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.' " (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) Accordingly, courts

applying the standard must view the evidence in the light most favorable to respondent and "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Kraft*, at p. 1053; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 357 ["We 'must accept logical inferences that the jury might have drawn from circumstantial evidence.' "].)

### 2. *Evidence of Premeditated Murder*

"A verdict of deliberate and premeditated murder requires more than showing of intent to kill." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*); but see *People v. Moon* (2005) 37 Cal.4th 1, 29 [noting that intent to kill satisfies the willfulness requirement].) A murder is deliberate if the defendant engaged in a "careful weighing of considerations in forming a course of action" and premeditated if "thought over in advance." (*Koontz*, at p. 1080.) However, a murder need not be planned out far in advance to be deliberate and premeditated. To the contrary, " ' "[p]remeditation and deliberation can occur in a brief interval." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*People v. Bloyd* (1987) 43 Cal.3d 333, 348; see *People v. Sanchez* (2001) 26 Cal.4th 834, 849.) However, a killing is not deliberate and premeditated if it was the result of " 'unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443; see also *People v. Bender* (1945) 27 Cal.2d 164, 183 [noting that deliberate is the opposite of " '[h]asty, impetuous, rash, impulsive' "].)

Since the Supreme Court's decision in *People v. Anderson* (1968) 70 Cal.2d 15, courts assessing the sufficiency of the evidence of premeditation and deliberation generally have examined three types of evidence: " 'planning, motive, and manner of killing.' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 424 (*Sandoval*).) Courts generally sustain first degree murder verdicts where all three types of evidence are present and also

6

where there is extremely strong evidence of planning or evidence of motive along with evidence of either planning or a deliberate manner of killing.  (*Ibid*.; but see *People v. Perez* (1992) 2 Cal.4th 1117, 1125 [noting that the *Anderson* factors are "helpful for purposes of review" but neither essential nor exclusive].)

In this case, the prosecution presented evidence of all three *Anderson* factors.

a.  <u>Planning</u>

Osman points out that there was no evidence that he went to the party at the apartment complex with the intent to commit murder or even that he had any preexisting animosity towards Hollingsworth, the victim.  While that is correct, there is no requirement that a plan to murder someone be formulated far in advance.  To the contrary, as the Supreme Court has recognized, even a "hastily made plan" may support a finding of premeditation and deliberation.  (See *Sandoval*, *supra*, 62 Cal.4th at p. 425.)  Here, the jury could have inferred such quick planning.

The video evidence presented by the prosecutor showed that at the beginning of the brawl at the party Osman was on a stairway observing the action.  A few seconds after Upchurch's jacket was pulled over his head, Osman appeared in the courtyard for the first time.  Osman maneuvered around the outside of the brawl, staying close to the wall, and briefly seemed to be trying to move others out of his way.  After some people moved out of his way, Osman shot Hollingsworth.  Then, Osman turned and made his way out of the party.

A jury reasonably could infer from this evidence that Osman shot Hollingsworth pursuant to a quickly formulated yet shrewd plan.  Osman's actions—his descent into the courtyard, his careful approach around the edge of the brawl, his shooting as soon as people moved out of his way, and his immediate getaway—suggest that he was acting deliberately and with some purpose.  The fact that Osman was able to shoot Hollingsworth largely unobserved—as Osman noted in a jail phone call, there were no

incriminating witnesses or statements in discovery—also suggests that he was acting according to a plan because it is unlikely that he would have been able to shoot someone unobserved by happenstance. Finally, the inference that Osman was acting according to a plan is supported by the absence of any evidence that he was provoked or otherwise acting on a rash impulse. (See *People v. Marks* (2003) 31 Cal.4th 197, 232 (*Marks*) [unprovoked shooting of an unarmed victim at close range "supported the inference that the killing was the product of a deliberate plan rather than a rash explosion of violence"].)

### b. Motive

The jury also reasonably could infer from the evidence that Osman had a motive. As noted above, Osman was on the stairs watching the brawl unfold in the courtyard below until someone pulled Upchurch's jacket over his head. After that, Osman began moving toward Hollingsworth, who had been behind one of Upchurch's assailants and may have appeared to be helping them. Thus, the sequence of events suggests that Osman was reacting to Upchurch's treatment, which Osman may have thought humiliating. This suggestion is reinforced by Osman's actions the next day. Although, as noted above, Osman moved stealthily and was able to shoot Hollingsworth unobserved, the next day Osman confided to Upchurch, who was so drunk the night of the party that he did not remember anything, that he had shot someone at the party. A jury reasonably could infer that Osman confided this dangerous information to Upchurch to ensure that Upchurch appreciated what Osman had done for him.

Osman asserts that he was not close with Upchurch, just a " 'friend of a friend.' " Be that as it may, there was evidence that they had a relationship because Osman knew Upchurch through a childhood friend. Thus, whether or not Upchurch was a close friend of Osman's, a jury reasonably could infer that they were members of a group of friends and that Osman shot Hollingsworth in response to the humiliation suffered by his fellow group member.

8

c. <u>Manner</u>

Finally, the manner in which Osman approached and shot Hollingsworth suggests premeditation and deliberation. There is no evidence that Osman was acting rashly or impulsively when he shot Hollingsworth. As noted above, there was no provocation, and Osman was not acting wildly. To the contrary, Osman approached Hollingsworth in a careful, calm, and focused manner, flanking the outside of the brawling in the courtyard and staying close to the wall during his approach. Then, when some partygoers moved away, he raised his gun, fired a single shot at Hollingsworth's center mass, pivoted, and got away. A jury could infer from this " 'calm,' 'cool,' and 'focused' manner" that Osman's actions were not rash and impulsive, but rather deliberate and premeditated. (See *Marks*, *supra*, 31 Cal.4th at p. 232.)

d. <u>Conclusion</u>

The evidence of deliberation and premeditation presented by the prosecution was not overwhelming, and a reasonable jury could have acquitted Osman of first degree murder. However, there was no evidence of provocation or that Osman was acting wildly from some unconsidered or rash impulse. To the contrary, the evidence showed that he acted in a careful, calm, and focused manner from which the jury reasonably could have found that all the *Anderson* factors—planning, motive, and manner—were satisfied. Accordingly, based on the evidence in the record, the jury reasonably could have found that Osman murdered Savion Hollingsworth with premeditation and deliberation, and therefore we conclude that sufficient evidence supports Osman's conviction for first degree murder.

**B. Instruction on Lying in Wait**

Osman argues that, even if there was sufficient evidence to convict him of first degree premeditated murder, his conviction should be reversed because the trial court erred in instructing the jury on first degree murder by means of lying in wait. Although,

9

as the People point out, Osman did not object to this instruction in the trial court, we nonetheless consider his challenge to the instruction because it may have affected substantial rights. (See § 1259 [appellate courts may review instructions absent an objection "if the substantial rights of the defendant were affected thereby"]; see also *People v. Valdez* (2004) 32 Cal.4th 73, 113 [a defendant who did not object at trial "may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete' "].) As explained below, we conclude that the lying in wait instruction should not have been given because there was not substantial evidence of lying in wait. However, for largely the same reason, this error was harmless.

To prove first degree murder by manner of lying in wait, the prosecution must establish three elements: (1) the defendant concealed his purpose, (2) the defendant passed a substantial period watching and waiting for an opportune time to act, and (3) the defendant launched a surprise attack on an unsuspecting victim from a position of advantage immediately thereafter. (*People v. Russell* (2010) 50 Cal.4th 1228, 1244 (*Russell*).) Although the record contained substantial evidence that Osman launched a surprise attack on Hollingsworth from a position of advantage, there was insufficient evidence of the first two elements for lying-in-wait murder.

First, there was no evidence that Osman concealed his purpose. The prosecutor argued in closing that Osman decided to attack Hollingsworth when he saw Upchurch's jacket pulled over his head. Afterwards Osman did not announce his intentions. However, he also did nothing to conceal them. Instead, he moved into the courtyard where there was still an active fight, moving directly toward the participants, albeit by an outside route.

Second, there was no evidence that Osman passed a substantial period of time watching and waiting for an opportune time to act. The prosecutor argued that Osman was watching and waiting on the stairs. However, the prosecution's theory was that

Osman formulated the intention to attack Hollingsworth only after seeing Upchurch's jacket pulled over his head, and, far from watching and waiting after that, Upchurch moved into the courtyard within seconds. Afterwards, while Osman went down to the courtyard and maneuvered towards Hollinsworth, he was moving and, thus, not watching and waiting for an opportunity to act. Finally, while Osman waited for bystanders to move aside before shooting Hollingsworth, he appeared to have been attempting actively to move them out of his way. In any event, Osman waited for at most four seconds. That short interval is not enough to constitute " ' " 'a substantial period of watching and waiting.' " ' " (*Russell*, *supra*, 50 Cal.4th at p. 1244; see also *People v. Stevens* (2007) 41 Cal.4th 182, 202, fn. 11 [period of lying and waiting must be long enough "to show a state of mind equivalent to premeditation or deliberation"].)

Where, as here, a trial court gives a legally correct instruction that is not supported by the facts, "the jury is fully equipped to detect" the error. (*People v Guiton* (1993) 4 Cal.4th 1116, 1129.) As a consequence, a factually unsupported instruction generally will be harmless, and the judgment affirmed, " 'unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory.' " (*People v. Perez* (2005) 35 Cal.4th 1219, 1233.) Osman contends that there is such a probability here because the prosecutor "paid special attention to the lying-in-wait theory of the offense" in closing argument. In fact, the prosecutor primarily argued that Osman was guilty of premeditated murder and only discussed the lying-in-wait theory for about three of the 38 pages of her closing argument. Although Osman's trial counsel did not respond directly to this argument— instead arguing for factual innocence—there is no reason to think that, in spite of the absence of any evidence supporting two of the theory's three elements, the jury convicted Osman based on a lying-in-wait theory.

Noting that lying in wait does not require proof of an intent to kill, Osman also asserts that the instruction might have "absolved the prosecution from having to prove intent to kill." However, the jury was expressly instructed that to be guilty of premeditated murder Osman had to have acted "willfully, deliberately, and with premeditation" and that Osman acted willfully "if he intended to kill." As a consequence, the jury could have convicted Osman of first degree murder without finding an intent to kill only if it found him guilty on a lying-in-wait theory—which, as just shown, it could not reasonably have done—or if it did not follow the instructions on premeditated murder. However, we cannot assume that the jury did not follow the instructions. To the contrary, "[w]e presume the jury followed the court's instructions." (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

Accordingly, we conclude that, while the jury should not have been instructed on the unsupported theory of murder by lying in wait, that error was harmless.

### III. DISPOSITION

The judgment is affirmed.

_____
BROMBERG, J.

WE CONCUR:

_____
GREENWOOD, P. J.

_____
DANNER, J.

*People v.Osman*
H052518